## FULTON CO. v. JANESVILLE LABORATORIES, Inc., et al.

## JANESVILLE LABORATORIES, Inc., et al. v. FULTON CO.

Circuit Court of Appeals, Seventh Circuit. August 30, 1927.

Nos. 3749, 3750.

1. Patents ⊕═328—971,838, for process of making corrugated metal walls, held not to violate rule against double patenting, because of prior patent to same person for the product.

Fulton patent, No. 971,838, for process of making corrugated metal walls, held not to violate the rule against double patenting, because of earlier patent to the same person for the product, disclosing how the product was produced, but sufficiently indicating the product as in itself an invention, as properly to stamp it the product patent it purports to be, especially as the later patent was separately applied for pursuant to an order for division made by the Patent Office on an earlier application, which included both product and process.

2. Patents ⊕═328—971,838; claims 1–5, for process of making corrugated metal wall, held valid and, except claim 1, infringed.

Fulton patent, No. 971,838, claims 1–5, for process of making corrugated metal wall, held valid and, except claim 1, infringed.

3. Trade-marks and trade-names and unfair competition ⊕═93(3).—Unfair competition by infringer of patent process in sale of product is negatived by absence of confusion and deception.

Absence of confusion and deception from and in sale by infringer of process patent of its product negatives unfair competition.

Appeals from the District Court of the United States for the Western District of Wisconsin.

Patent infringement suit by the Fulton Company against the Janesville Laborato-

ries, Inc., and another. From different parts of the decree, both parties appeal. Affirmed.

Loyd H. Sutton, of Washington, D. C., for appellant.

Frank Liverance, Jr., of Grand Rapids, Mich., for appellees.

Before ALSCHULER, EVAN A. EVANS, and PAGE, Circuit Judges.

ALSCHULER, Circuit Judge. Defendants below appeal from decree finding valid claims 1, 2, 3, 4 and 5 of United States patent No. 971,838, October 4, 1910, to Fulton, and all but claim 1 infringed. The Fulton Company appeals from so much of same decree as finds claim 1 not infringed, and defendants below not guilty of unfair competition.

Judge Luse, before whom the cause was heard in the District Court, rendered an opinion therein which appears in the margin.[1] The facts are there sufficiently stated.

[1] Luse, District Judge. Complainant's bill filed September 10, 1923, charges the individual defendant, Leach, acting as an individual and as an officer and in control of the defendant corporation, and the corporation, with using the process of making expansible and collapsible tubular metal walls embraced in Fulton patent No. 971,-838, assigned to plaintiff. The bill also charges the defendants with unfair competition, in that defendants have copied plaintiff's process of manufacture and imitated the products of plaintiff's manufacture, with the intent and purpose, successfully carried out, of deceiving the purchasing public in the purchase of defendant's product in place of plaintiff's product.

The claims of the patent in suit are five in number. The fourth claim is identical with the second, except that, immediately following the phrase "consisting in forming a thin walled metal tube," the phrase "annealing said tube" is inserted. The fifth claim is identical with the third, except that the phrase "annealing said tube" is inserted immediately following the phrase "consisting in forming a thin walled metal tube." The first three claims of the patent are as follows:

"1. The process of making flexible corrugated metal walls, consisting in forming a thin walled tube, forcing the metal of the tube outward from the axis of the tube to form broad corrugations therein with narrow uncorrugated portions connecting the broad corrugations, then deepening and narrowing said corrugations while subjecting the metal at the bends to a metal rolling operation to toughen and temper the metal in said curved portions.

"2. The process of making flexible corrugated metals walls, consisting in forming a thin walled metal tube, forcing the metal of the wall outward to form broad corrugations, reducing the radius of curvature of the bends at said outwardly extending corrugations while transferring into the lateral portions, portions of said bends, and subjecting said curved portions to swaging pressure to toughen and temper the metal in said curved portions.

[1] In the briefs and oral argument here for defendants below the defense of double patenting is mainly relied on to defeat the patent. The contention is that United States patent No. 947,229 to same inventor, antedating by several months the patent in issue, is for the same invention. The patent in suit is for a process, and the earlier patent pur-

"3. The process of making flexible corrugated metal walls consisting in forming a thin walled metal tube, forcing the metal of the wall outward to form broad corrugations, leaving narrow uncorrugated connecting portions between the outwardly extending corrugations, reducing the radius of curvature of the bends of said outwardly extending corrugations while transferring into the lateral portions, portions of said bends, and forcing the metal in said narrow uncorrugated portions into inwardly projecting corrugations, and subjecting the curved portions of said first-named bends to swaging pressure to toughen and temper the metal in said curved portions."

The invention as stated in the specification relates to processes of making flexible corrugated metal walls for collapsible and expansible vessels, particularly for the class used for confining fluids under pressure and has for its object the production of corrugated metal walls of high resilience and of great strength and durability and which can be collapsed and expanded many times while confining fluids under pressure without material injury to the wall. The original application filed April 3, 1907, was a combined application for a process and product patent. The Patent Office ordered a division, the examiner saying:

"Since the article may be made by other processes than that claimed, the inventions are independent and division is accordingly required before further action may be taken on the merits."

Division resulted accordingly, and the application for the patent in suit was filed July 22, 1909, and a patent granted October 4, 1910.

One of the steps of the patented process, which is the subject of controversy between the parties and which will be taken up first, is the process of forming first broad, outwardly extending corrugations in which the thin metal tube is pressed over a die roll and under a matrix roll, there having been inserted in the tube an expanding brace. In operation the matrix roll is lowered into contact with the tube and pressed toward the die roll. The shafts upon which the two rolls are mounted are rotated, with the result that the die roll, operating upon the interior of the tube, presses a portion thereof outwardly in the form of an outward corrugation into the sinus of the matrix. During this operation the expansion brace is located beneath the flange of the matrix roll, and, as the patent puts it, "prevents the inward swaging of the tubular wall during the action" of the rolls. The plaintiff has long since abandoned the use of the rolls and expansion brace in forming the first broad outward corrugations, and uses instead an expanding mandrel, which has an expanding element made up of eight segments; the mandrel being inserted into the tube and the expanding element is there expanded, forcing a portion of the tube outward

ports upon its face to be for a product. But it is contended that the earlier patent is, in

fact, for a process, and the same process as the other, and that the later patent is there-

ly into a broad outward corrugation. This is the process which the defendants follow. It is the claim of the defendants that they, as well as the plaintiff, have thus omitted one of the essential steps of the patented process in that: A. By the use of the mandrel no "narrow uncorrugated connecting portions between the outwardly extending corrugations" are left in the sense in which the phrase last quoted is used in claims 1, 3, and 5 of the patent. B. That an excess of temper and toughness in the outer bends of the outer corrugations over the bends of the inner corrugations is a prime characteristic of the patented process in which the presence of the expansion brace is essential.

As to "A," it is admitted by the defendants in their answer to the tenth interrogatory that in their use of the mandrel the broad outward corrugations are so located with reference to one another as to leave the portions between such corrugations narrower than the outward corrugations. The term "narrow" being a relative one, it is apparent that the use of the mandrel does not prevent the leaving of narrow portions of the tube between the broad corrugations. Nor is any reason perceived for attributing to the word "uncorrugated" any unusual meaning, and while the use of the mandrel may result in the surface of the tube following what is often called a sine curve, nevertheless the portions of the tube between two outward corrugations formed by the mandrel are as clearly uncorrugated in that such portions have not been made the subject of a process of corrugating as though the expanding brace had been used in opposition to the surface of the flange of the matrix roll. True the use of the brace serves to prevent the inward forcing of the narrow uncorrugated portions but as will more fully appear later, I deem the use of the brace a part of the illustrative method of following the process rather than an essential thereof.

As to contention "B," it is to be borne in mind that the means of carrying the process into effect described in the patent is only illustrative. This is common in process patents and in the instant case such description is introduced with the words "the inventive idea is capable of expression in a variety of methods, one of which for the purpose of illustration is hereinafter specifically described." The conclusion is therefore reached that the use of the expanding mandrel by the parties is not an effective departure from the process of the patent, and that in the process used by the defendant narrow uncorrugated portions are left connecting the broad corrugations, within the meaning of the claims 1, 3, and 5.

In defendant's process, however, there are no rolls or their equivalent used in opposition to one another, between which the metal of the tube is rolled, and I therefore find that the defendant does not use a metal rolling operation, as the term is used in claim 1 of the patent.

Considerable testimony and argument has been heard with reference to the meaning of the phrase "subjecting the said curved portions to swaging pressure to toughen and temper the metal in said curved portions," found

in all of the claims save the first, with particular reference to the meaning of the word "swaging pressure." The term "swage" is defined in Hawkins Mechanical Dictionary as "a tool, variously shaped or grooved on the end or face, used by blacksmiths or other workers in metals, for shaping their work, whether in sheet metal or forging, by holding the tool upon it, or the work upon the tool, and striking with a sledge."

Webster's definition is the same, and the latter says the verb "to swage" means "to shape by means of a swage." The Century Dictionary's definition of the noun is "a tool or die for imparting a given shape to metal when laid hot on an anvil, or in a stamping press or dropping press, or between rollers. It assumes many shapes, as an indenting or shaping tool or as a die for striking up said metal or in stamping or presses. Stamping presses are sometimes called swage machines."

Whatever may be the lexicographer's definition of the word "swaging," it is quite clear that, as used in the patent in suit, the term does not contemplate that such portion of the tube as is being subjected to swaging pressure must be bottomed against an opposing surface. The expanding brace heretofore referred to is spoken of as preventing the inward swaging of the tubular wall by the opposing surface of the matrix flange, and the action of the flanges of the matrix roll in subsequent steps of the process where the expanding brace is not used and where no surface is in apposition to the inner surface of the inward corrugations, is termed swaging. In view of these applications of the term by the patentee, the intent to use the term in a sense limited to pressure of the metal by one roll or tool against the surface of another in the process of swaging is so negatived as not to warrant, much less require, such a limitation. Pressure by a shaping tool stretching and bending the metal is what was intended, as I view it. That the drawings of the patent illustrate the outer corrugations in their extreme positions, bottomed against the curved surface of the sinus of the matrix, is of no particular moment, inasmuch as there is nothing to indicate that the working of the metal is to continue after such contact is effected. That the defendants avoid such bottoming, does not, in my opinion, differentiate their process from "swaging" as that term is used in the patent in suit. Defendants define their process as "spinning" rather than swaging, but spinning is a process spoken of in the specifications as one which might be used instead of the rolling process, without departure from the essence of the invention.

Thus construed, defendant's method clearly infringes. It is immaterial that they add steps to the process which they consider improves the product, so long as they slavishly follow the patented process so far as it goes. Tilghman v. Proctor, 102 U. S. 707, 731 et seq., 26 L. Ed. 279; Lalance & Grosjean Mfg. Co. v. Haberman Mfg. Co. (C. C.) 53 F. 380; Ford Morocco Co. v. Tannage Patent Co. (C. C. A.) 84 F. 644. But it is earnestly contended that if the patent be so construed it is invalid, being anticipated, it is said, by five prior art patents—three United States patents, Daelen No. 266,976, dated No-

fore void. The opinion of the District Court does not deal specifically with this contention.

vember 7, 1882; Emery & Gentner, No. 297,-244, dated April 22, 1884; Hollerith & Metcalf, No. 349,718, dated September 28, 1886; one English patent, Webster, No. 825, dated October, 1, 1856; and one German, issued to Koffler No. 98,096, April 25, 1897.

No evidence is given tending to show that the methods of these patents have ever been used and the testimony indicates that no one piece flexible corrugated tubular walls were known, having or in any degree approximating the highly sensitive flexibility of the Fulton bellows, prior to Fulton. Four of the above patents relate to the manufacture of expansion joints, indicating the use of comparatively heavy tubes with corrugations comparatively shallow, designed to afford but slight elasticity when compared with that which results from the Fulton process as applied to the type of tube contemplated. When it is borne in mind that the Fulton process is intended to operate on extremely thin tubes, those ordinarily used being .003 to .008 inches in thickness, and that the requisite corrugations must be deep, it is apparent that machines or processes intended to form corrugations in tubes to be used in expansion joints in steam pipes, boiler flues and tubes, condensers, couplings between locomotives and their tenders, hose for fire engines, etc., are not likely to disclose a method of dealing with a tube so frail as that, the forming of which is the first step of the Fulton process. Nor do they. The evidence indicates that Fulton tried out most, if not all, of these processes in his efforts to solve his problem but without success and defendants apparently perceive little of virtue in them, if their adherence to the Fulton process be given weight.

The Daelen patent, most relied on, does not deal with expansion joints, however, but covers a machine "for corrugating plates and tubes." The drawings and specifications disclose a machine for corrugating sheets of metal, but the inventor says that the machine "may also be used for pressing corrugations into tubes." Some doubt may exist as to whether or not the machine would operate to form corrugations in a tube, except in the form of a helix; but, laying that and other doubts aside, the Daelen machine assuredly does not operate to "reduce the radius of curvature of the bends" during successive operations nor to "transfer into the lateral portions, portions of said bends." The steps of the Fulton process last above quoted indicate important elements thereof, to wit, the swaging by successive sets of rolls or tools, progressively narrow, so that the corrugations are not only deepened but narrowed, and portions of the bends transferred into lateral portions of the corrugations, thus giving that increase of temper as one approaches the curve of the bend where the maximum of toughness exists. This same distinction exists between the process in suit and the machines or processes disclosed in Emery No. 297,244, Hollerith, No. 349,718, and Koffler, the German patent, No. 98,096, all three of which use hydraulic pressure as a means of forcing the corrugations outward and relate to the manufacture of expansion joints as already indicated.

The Webster patent (English, 1856) discloses a series of operations, using rolls progressive-

The product patent shows a structure which, while produced as there specified, and ly narrow, but applied wholly upon the exterior of the tube to make and deepen inwardly extending corrugations only. This patent discloses no method of preventing the inward crumpling of the tube. Assuming that the Webster machine would successfully corrugate tube for the purposes specified, to wit, for couplings of locomotives with their tenders, hose for fire engines and other like purposes, they being of sufficient thickness and weight to withstand the contemplated operations, I find that this method would not be successfully operative upon the thin tube used in the patented process. In all probability the thin tube of the process in suit would crumple under the pressure, but if not that, I am convinced that body wrinkles, so called, would result, to the serious detriment of the product. Furthermore the ripe age of this patent, the years of which seem barren of actual contribution to the art, tend to deny it a status anticipating the quite substantial contribution of the Fulton process.

Other earlier patents have been referred to but not seriously pressed and it is not thought necessary to treat them separately. All have been considered.

In accordance with the foregoing, I find claims 2, 3, 4, and 5 of the patent valid and infringed. I find claim 1 is not infringed.

On the issue of unfair competition I find for the defendants. The defendant Laboratories Company has made and sold thermostatic regulating devices suitable for use in automobiles to automobile manufacturers. These devices combine the tubular wall, a process for making which is the subject of what has been said, with rigid end plates, making a hermetically sealed inclosure in which is confined a volatile fluid. Such devices are not easily distinguishable from those produced by complainant. On the latter's device for similar purposes the name "Sylphon" is stamped in the plate at one end of the device, while those of the Laboratories omits any designation or distinguishing mark. Both types of devices are strictly utilitarian and except as just indicated, bear no marks. So far as the tubular wall of the respective devices is concerned, neither concern gives it any distinguishing mark, nor could that well be done, I think, without detriment to the strength or efficiency of the wall. However, the defendant Laboratories have sold such devices exclusively to manufacturers of automobiles whom it has informed that the devices were not of complainant's manufacture, and I find no deception nor confusion of goods has resulted. To the claim of complainant that users of automobiles will be likely to attribute failures of the Laboratories device to complainant's to the injury of the latter, it is sufficient to say that such contention wanders into the field of speculation. Also there is no evidence suggesting much less warranting a conclusion, that the devices of the Laboratories are any less efficient or durable than those of complainant. The conclusion being that there is no deception nor confusion of goods, nor is there any probability of same, it becomes unnecessary to determine the effect of the fact that complainant had a patent, No. 760,443, dated May 24, 1904, and which expired in 1921, prior to defendants' entry into the field, which covered "a hermetically sealed

substantially as described in the process patent, is distinctive in that it describes a product having an increased toughness and resiliency at specified locations, needless here to be specifically considered, since that patent is not here in issue. It is narrowly limited, and presumably was not deemed to have been infringed, else it would also have been sued upon, as was the case in Fulton Co. v. Bishop & Babcock Co., 17 F.(2d) 999, where both of the patents were sued upon, and the District Court found the product patent not infringed, but all of the claims of the process patent valid and infringed—that decree being affirmed in the Sixth C. C. A. Fulton Co. v. Bishop &. Babcock Co., 17 F.(2d) 1006 (March 7, 1927).

One of the conditions upon which a patent monopoly is granted is that in the application there be made such disclosure as will enable the public to practice and to have the beneficial use of the invention when the monopoly expires. The patent is therefore none the less for a product from the fact alone that it discloses how to make it.

The salutary rule against double patenting is directed against the evil of prolonging by subsequent patent the monopoly of an earlier grant. But where, as here, the later patent was separately applied for pursuant to an order for division made by the patent office upon an earlier application, which included both product and process, the conclusion of double patenting will not so readily follow. Aurora Mantle & Lamp Co. v. Kaufman (C. C. A.) 243 F. 911.

Although the earlier patent indicates how the product is produced, we are satisfied that that patent does sufficiently indicate the product as in itself an invention, as properly to stamp it the product patent it purports to be, and that the two grants are not, in this respect, for the same invention, and we are well assured that the challenge of the patent's validity on the ground of double patenting has not been sustained.

[2, 3] The contention of defendants below that they did not follow the process of the claims found infringed, and of the Fulton Company that defendants below did infringe claim 1, and were also guilty of unfair competition, were fully and properly treated in

expansible and collapsible vessel containing a saturated vapor and consisting of rigid end walls connected by corrugated walls yielding along the line of one dimension only" (claim 2). For whether or no the issue involves practices during or after the life of a patent, absence of confusion and deception negatives unfair competition. Burns Co. v. Automatic Safe Co. (C. C. A.) 241 F. 472, 486.

the District Court opinion, and need not here be further discussed, and we agree in its conclusion that these contentions are not sustainable.

We are impressed by what the Circuit Court of Appeals of the Second Circuit said in the last paragraph of its opinion in Fulton Co. v. Bishop & Babcock Co., supra, respecting the matter of reasonable royalty; and we suggest that the master investigate, and report, inter alia, what during the infringing period would have been a reasonable royalty.

The decree of the District Court is affirmed.